**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| SANDRA DRAKE and RANDY SMITH, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:14-cv-01535-JAR |
| STEAK N SHAKE OPERATIONS, INC., | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs' Motion to Certify (Doc. 130) and Defendant's Motion to Decertify (Doc. 134).

**Background**

As set out in the Court's previous orders, Plaintiffs are forty-six current and former salaried managers at Steak-N-Shake ("SnS"). Plaintiffs filed a class action under Federal Rule of Civil Procedure 23, alleging that SnS failed to properly pay them overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and Missouri law. SnS maintains that the Plaintiffs are exempt from overtime protection because their primary job duties are executive or administrative. On December 17, 2015, the Court granted the parties' joint stipulation of conditional certification of a putative class of plaintiffs. (Doc. 39.) The parties conducted limited discovery on the issue of certification.

On May 30, 2017, Plaintiffs moved to formally certify a class of "All persons who worked as Defendant Steak N Shake ('SnS') Managers at all corporate owned retail restaurants located in the State of Missouri at any time from September 8, 2012 to the present." (Doc. 130.)

The same day, Defendant moved to decertify the conditional FLSA class.  (Doc. 134.)  The motions are now fully briefed and pending before the Court.

**Discussion**

**I.      SnS's Motion for Decertification**

SnS moves the Court to decertify the conditional FLSA class because "Plaintiffs are not similarly situated with respect to the key issues underlying their claims, the experiences of one Plaintiff is not representative of any other and, as such, the claims of the group cannot be adjudicated without inquiring into each individual's particular circumstances."  (Doc. 135 at 4.)  The standard for obtaining conditional certification is not rigorous; Plaintiffs must only show a "colorable basis for their claim" and "that a class of similarly situated plaintiffs exists."  *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo. 2014) (citation omitted).  The standard for avoiding decertification, however, is much stricter.

**A.      Legal Standard**

A collective action under the FLSA to recover overtime compensation may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  "Plaintiffs seeking to maintain an opt-in class action bear the burden to show that they are similarly situated."  *Kautsch v. Premier Comm'ns*, No. 06-CV-04035-NKL, 2008 WL 294271, at *1 (W.D. Mo. Jan. 31, 2008).  "If the [class members] are similarly situated, the district court allows the representative action to proceed to trial.  If not, the district court decertifies the class, dismisses without prejudice the opt-in plaintiffs, and allows the class representative[s] to proceed to trial on [their] individual claims.  The decision to certify or decertify a collective action under section 216(b) is within the district court's discretion."  *White v. Baptist Mem'l Health Care Corp.*, 08–2478, 2011 WL 1883959, at *4 (W.D. Tenn. May

2

17, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012); *Baptist Mem'l*, 2011 WL 1883959, at *4 (citations and internal quotation marks omitted).

That said, similarly situated "does not necessarily mean identical." *Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *2 (E.D. Mo. Mar. 31, 2017). Every group of plaintiffs will necessarily include individuals with different experiences. "[T]he question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *14051 Manchester*, 301 F.R.D. at 372 (quoting *Baptist Mem'l.*, 2011 WL 1883959, at *4).

Courts analyze three factors based on information gained from discovery to determine whether the Plaintiffs are similarly situated:  (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *14051 Manchester*, 301 F.R.D. at 372 (citation omitted).  "In ruling on the Motion for Decertification, the Court recognizes the remedial purpose of the FLSA." *Id*. at 374 (citing *Gomez v. Tyson Foods, Inc.*, 8:08CV21, 2013 WL 7045055, at *8 (D. Neb. Feb. 11, 2013); *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846 (8th Cir.1975) ("The Fair Labor Standards Act is remedial in nature, its purpose is to protect employees, and it must be interpreted in a manner consistent with that purpose.").

### B.      Analysis

First, SnS moves for decertification on the ground that Plaintiffs' employment experiences differ significantly from store to store, supervisor to supervisor, and shift to shift.  It argues that those differences outweigh the similarities and are more relevant to the plaintiffs' classification as exempt salaried employees.  Second, SnS argues that it has a variety of defenses

against individual plaintiffs that it would not be able to assert against the class as a whole or test through representative testimony.  Last, SnS argues that, if the Plaintiffs were allowed to proceed as a class, it would be unfair and procedurally untenable because the action would require numerous "mini-trials" in which SnS cross-examines each Plaintiff as to his or her specific employment experiences.  It asserts that Plaintiffs' trial plan is inadequate to explain how the Court would manage those procedural difficulties.

          1.       "Single, FLSA-Violating Policy"

"Plaintiffs may be similarly situated when 'they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'"  *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014), *aff'd and remanded*, 136 S. Ct. 1036 (2016) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009)).  Plaintiffs allege that they all suffer from the same SnS corporate policy of misclassifying Managers as exempt executive or administrative employees. (Doc. 142 at 24.)

Exempt classification under the FLSA turns largely on an employee's primary duties.  An employee is an exempt executive when (1) he or she meets the minimum compensation requirements; (2) his or her primary duty is management of the enterprise or one of its departments or subdivisions; (3) he or she customarily and regularly directs the work of two or more other employees; and (4) he or she has the authority to hire or fire other employees or particular weight is given to his or her suggestions and recommendations as to another employee's hiring, firing, advancement, promotion or other change of employment status.  29 C.F.R. § 541.100.  An employee is an exempt administrator when (1) he or she meets the minimum compensation requirements; (2) his or her "primary duty is the performance of office

or non-manual work directly related to the management or general business operations"; and (3) his or her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.  Employees whose primary duties involve a combination of exempt administrative and exempt executive work still qualify as exempt.  29 C.F.R. § 541.708.

When trying to ascertain an employee's primary duty, the Court considers the following factors:  "the relative importance of the exempt duties as compared with [other] duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the [same] nonexempt work."  29 C.F.R. § 541.700.  "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee" but "is not the sole test"; "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement."  *Id*.  That said, employees who perform both exempt and non-exempt work but are "closely supervised and earn little more than the nonexempt employees . . . generally would not satisfy the primary duty requirement."  *Id*.

Plaintiffs all shared the same job title:  Manager.  According to SnS, each restaurant is run by a General Manager ("GM").  (Doc. 135 at 5-6.)  The Manager is directly below the GM. (*Id*. at 6.)  Below the Manager is the Operations Supervisor, who directs the Production and Service Trainers, who are senior to the front-line production and service associates.  (*Id*. at 6.) Some stores also employ a Restaurant Manager, a position SnS describes as a GM waiting for his or her own store.  The Restaurant Manager has a lateral relationship with the Manager, reporting directly to the GM.  (*Id*.)  General Managers report to a District Manager, who supervises

multiple stores throughout a geographical region.  (*Id.*)  Above the District Manager is the Division President.  (*Id.*)

SnS's corporate job description makes Managers responsible for supervising each shift; maintaining food safety; "train[ing,] coach[ing,] and inspir[ing] Associates"; making decisions and solving problems; and ensuring adherence to state and federal law.  (Doc. 135 at 7.)  On paper, Managers are expressly authorized to discipline associates and participate in hiring, promotion, and termination.  (*Id.* at 7-8.)  In addition, SnS regularly asks Managers to review and sign a "Certification of Job Duties," which states that a Manager "should devote the majority of your work day to your primary 'management' tasks."  (Doc. 135-31 at 1.)  The form lists those tasks as follows:

> Identify and solve operations issues[;]
> Communicate shift expectations and goals to associates[;]
> Manage and direct associates' work and evaluate their performance[;]
> Review clock in and out times of hourly associates[;]
> Maintain cash controls[;]
> [A]udit food safety and cleanliness standards[;]
> Forecast sales and labor, order food, and ensure timely associate training[; and]
> Participate in hiring, promotion, discipline, and termination decisions.

(*Id.*)  By signing, Managers affirm that they understand their primary duties and are advised to contact SnS's legal department, the District Manager, or the Division President "[i]n the event you believe that you devote the majority of your time to non-management tasks (e.g. service and/or production tasks that should be completed by hourly associates)."  SnS argues that, together, the job description and Certification show that a Manager's primary duties are a combination of managerial and administrative.

Plaintiffs argue that their actual experiences working in stores differ dramatically from the SnS job description and assert that they signed the Certifications despite knowing they were

inaccurate.  (Doc. 142-22.)  Indeed, they testified that they were required to sign the forms to keep their jobs and that their superiors were commonly aware that their actual job functions were significantly different than those listed.  (*Id*.)  In support, Plaintiffs present deposition testimony from eighteen Managers in the conditional collective.  All eighteen testified that managing employees was not one of their most important duties.  (Doc. 142-18.)  Instead, they testified that their most important job duties were the same non-executive, non-administrative, manual food production and service functions performed by hourly workers.  (Docs. 142-3; 142-5.)  They testified that their stores would not function without a manager making food, working the drive-thru, and serving customers (Doc. 142-4), and they therefore spent the vast majority of their time performing these non-exempt tasks (Doc. 142-2).

In addition, the deposed plaintiffs testified that their primary job duties did not vary based on location or supervision (Doc. 142-6), and most stated that their job duties and authority did not change even when they were the most senior employee in the store (Doc. 142-7).  Plaintiffs assert that this is because their work was tightly controlled by SnS policy and that they were always subject to the oversight of GMs and District Managers.  (Doc. 142-17.)  The deposed plaintiffs also testified that they had very little independence or discretion in how to manage the restaurant.  (*Id*.)

Moreover, Plaintiffs' expert determined that "the overall average hourly rate of pay for the 46 class members during the applicable time period 'is equivalent to a regular hourly pay rate of approximately $9.54.'"  (Doc. 131 at 46 (quoting Doc. 131-18 at 10).)

Given that their time was spent primarily on non-exempt work, the deposed plaintiffs testified that they rarely directed employees in any meaningful way.  (Doc. 142-18.)  Several testified that they might tell an hourly employee which food prep station to work or would

correct an hourly employee if he or she made a mistake but that they seldom had time to truly manage employees.  (*Id.*)  Further, they testified that what little direction they did give largely overlapped with the authority given to the hourly Operations Supervisor and Production Trainers.  (*Id.*)

The deposed plaintiffs also uniformly testified that their opinions regarding employment decisions were typically given little, if any, weight.  All eighteen testified that they lacked the authority to unilaterally hire or fire employees (Doc. 142-8), and those who participated in hiring described a highly-structured process that allowed for very little autonomy (Doc. 142-12). According to the deposed plaintiffs, their input regarding employees' pay rates and promotions were often ignored (Doc. 142-10), and their occasional participation in disciplinary matters was minor and largely ineffectual (Doc. 142-15).

The Court concludes that Plaintiffs' testimony suggests the existence of "a single, FLSA-violating policy" affecting the entire collective.  *Bouaphakeo*, 765 F.3d at 796.  Of note, Plaintiffs uniformly testified that their primary job duties were neither managerial nor administrative, that they spent a significant majority of their time doing work nearly identical to hourly production employees, that their work was closely supervised by their superiors, and that their participation in employment matters was rare and limited.  These facts weigh against decertification.

### 2.   Disparate Factual and Employment Settings

SnS argues that, even if Plaintiffs are not exempt executive or administrative employees, their individual job experiences varied so widely that they were not similarly situated.  (Doc. 135 at 28-40.)  SnS cites several instances in which individual plaintiffs testified that their job duties

changed based on location and management and argues that these fact-intensive differences are not conducive to collective proof, requiring decertification.

Two plaintiffs testified that they worked in restaurants without a GM where a Manager assumed the role as the most senior employee and fulfilled all of the GMs' executive and administrative duties.  (Doc. 135-15 at 7; Doc. 135-23 at 9.)  Three testified that GMs differed when it came to allowing Managers to interview potential employees.  (Doc. 135-8 at 27-28; Doc. 135-9 at 41; Doc. 135-12 at 30.)  Some plaintiffs were directly involved in scheduling and some never participated at all.  (Doc. 135-10 at 42; Doc 135-20 at 25; Doc. 135-4 at 38; Doc. 135-21 at 16; Doc. 135-11 at 19.)  Plaintiffs described a range of participation in disciplining subordinates.  (*See, e.g.*, Doc. 135-12 at 39; Doc. 135-15 at 52.)  One plaintiff testified that she worked for two GMs who delegated food ordering to her and worked for three GMs who did not. (Doc. 135-12 at 29-30.)  Another testified that staffing levels at the three stores she managed varied dramatically, which had a significant impact on how much time she could devote to managerial tasks at each store.   (Doc. 135-10 at 24.)  SnS argues that these differences demonstrate the need for individualized fact finding and support its position that the Plaintiffs are not similarly situated.

The Court disagrees.  While SnS can identify several factual differences in the Plaintiffs' employment experiences, the relevant question is "whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected."  *14051 Manchester*, 301 F.R.D. at 372.  Considering the Plaintiffs' largely uniform description of their actual experiences, the Court concludes that the differences SnS identifies do not outweigh the similarities Plaintiffs describe.  This is especially true when those similarities relate directly to whether SnS Managers' primary job duties are executive or administrative.  Put simply, the

Managers' experiences were similar in the most important ways.  This factor weighs against decertification.

### 3.   Individualized Defenses

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 313 (D. Md. 2014) (quoting *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007)).  Generally, "[d]efenses raised as to individual Plaintiffs, i.e., unclean hands, judicial estoppel, and [timeliness], further highlight the distinctions between the Plaintiffs' claims and, therefore, favor decertification." *Arnold*, 2017 WL 1251033, at *8 (citing *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 300-01 (E.D. Penn. 2010)).

SnS asserts that, in addition to its exemption defense, it has numerous defenses to the claims of individual Plaintiffs which it is entitled to litigate based on individual proof.  (Doc. 135 at 41.)  It asserts that any plaintiff who signed a Certification of Job Duties is guilty of affirmative misrepresentation and is barred from asserting an FLSA claim against SnS by the doctrine of unclean hands.  (*Id*. at 44-45.)  Therefore, SnS argues, individualized fact finding is necessary to determine whether each plaintiff signed the form.  (*Id*.)  The Plaintiffs respond that seventeen of the eighteen deposed plaintiffs testified the same:  that the forms were inaccurate but that they were required to sign them, even when their superiors knew they were inaccurate.  (Doc. 142 at 28.)  The eighteenth could not remember if she was ever asked to sign a Certification.  (*Id*.)  Thus, Plaintiffs argue, representative testimony will allow the Court to determine whether SnS has proven that the Plaintiffs acted in bad faith.

Next, SnS asserts that some of the Plaintiffs failed to identify the potential FLSA claim in bankruptcy proceedings.  (Doc. 135 at 45-46.)  Such claims are judicially estopped unless their omission was due to a good-faith mistake.  *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047, 1049 (8th Cir. 2006).  Again, SnS argues that individual fact finding is required to determine whether any of the remaining plaintiffs participated in a bankruptcy proceeding, declared the claim, or failed to do so by good-faith mistake.  (Doc. 135 at 46.)  In response, Plaintiffs cite several cases in which courts have allowed the collective action to proceed and saved the bankruptcy-discharge issue for after trial, in the event defendant was held liable.  (Doc. 142 at 31-32.)

Lastly, SnS asserts that several of the individual plaintiffs' claims may be time-barred, depending on whether they can prove that SnS willfully violated the FLSA.  (Doc. 135 at 46-49); 29 U.S.C. § 255(a) (extending the FLSA statute of limitations from two years to three years when the cause of action arises out of a willful violation of the Act).  To that end, at least one plaintiff testified that her personnel file included forged documents and that she was asked by her District Manager to forge other employees' signatures.  (*Id*. at 48.)  Once more, SnS asserts that it cannot defend against Plaintiffs' willfulness allegation unless it is able to individually cross-examine each plaintiff.  (*Id*.)  Plaintiffs respond that *they* bear the burden of proving willfulness and that they can do so "through common evidence that applies to all Plaintiffs, including, but not limited to, [SnS's] basis for classifying and later reclassifying Plaintiffs as exempt, and [SnS's] knowledge and/or lack of knowledge relating to the actual duties performed by Plaintiffs."  (Doc. 142 at 33.)

The Court concludes that SnS's individual defenses are not sufficient to compel decertification.  Plaintiffs' testimony suggests that it was a uniform SnS policy to ask Managers

to sign the Certification of Job Duty forms, and therefore, like the exemption defense, the matter is not "peculiar to some individual class members," but rather a collective-wide question of fact. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d ed. 2005)). Whether an individual plaintiff failed to properly disclose his or her claim in a bankruptcy proceeding requires individualized fact-finding, but that does not necessarily compel decertification. First, SnS can easily ascertain which plaintiffs were involved in bankruptcy proceedings and can challenge those plaintiffs' claims through individualized motions, and second, the number of plaintiffs subject to this defense is undoubtedly small—SnS identifies eight—too small to dictate the Court's treatment of the entire collective. Finally, timeliness is at issue in every collective action. Like judicial estoppel, SnS can easily ascertain whether each plaintiff worked as a Manager within the appropriate time period. Any plaintiff whose work history does not clearly indicate whether his or her claim is timely can be challenged through an individualized motion.

Ultimately, the Court recognizes that some of SnS's affirmative defenses are not conducive to representative testimony but concludes that SnS can still pursue those defenses through individualized motions. This factor neither weighs for nor against decertification.

### 4.   Fairness and Procedural Concerns

Finally, the Court must "determine whether it can coherently manage the class in a manner that will not prejudice any party." *Rawls*, 244 F.R.D. at 302 (internal quotation omitted). "The court should consider the primary objectives of allowance of a collective action under § 216(b), namely (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact

that arose from the same alleged activity." *14051 Manchester*, 301 F.R.D. at 377 (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000)).

SnS proffers three procedural barriers to a fair trial. First, it argues that because of the disparate factual and employment settings represented by the Plaintiffs, liability cannot be determined on a collective-wide basis. (Doc. 135 at 49.) Second, SnS argues that the named plaintiffs have significant credibility issues, which makes them inappropriate representatives of the collective and requires individual cross-examination by the defense. (*Id*. at 51-54.) Third, SnS argues that Plaintiffs' trial plan is so inadequate that the Court cannot properly gauge the fairness of their proposal. (*Id*. at 54-67.) SnS asserts that these procedural obstacles foreshadow significant costs, make a collective trial inefficient, and would require the Court to resolve numerous issues of law and fact that are not collectively applicable to all of the Plaintiffs.

a.   Collective-Wide Liability

SnS first argues that individual plaintiffs' disparate factual and employment settings and its own individual affirmative defenses make it impossible to determine liability as to the collective as a whole. It asserts that any collective action would inevitably devolve into numerous "mini-trials" in which an individual plaintiff is cross-examined as to whether his or her particular employment experiences qualify as exempt, whether he or she signed a Certification of Job Duties form, whether doing so rises to the level of unclean hands, whether he or she went through bankruptcy proceedings and, if so, whether his or her FLSA claim was properly included, whether he or she timely brought suit.

The Court concludes that proving liability on a collective-wide basis is possible in this case. The only relevant issue—SnS's routine classification of Managers as exempt—applies the same to all Plaintiffs. As discussed above, the material aspects of Plaintiffs' employment

experiences are more alike than different and therefore the issue of liability is common to all of them and can be efficiently resolved.  To the extent SnS argues that its individualized defenses will undermine the efficiency of the trial, the Court again notes that SnS's most fact-intensive defenses may be asserted before trial through individualized motions.

       b.    Credibility Issues

SnS next argues that material inconsistencies exist between how some plaintiffs described their job duties and other aspects of their employment at SnS before and after meeting with legal counsel.  (Doc. 135 at 52, n.199.)  SnS asserts that those inconsistencies undermine individual plaintiffs' credibility and require individual probing to resolve.  Plaintiffs argue that the "substantial similarity among [its] relatively small (46 plaintiff) class" means individual credibility determinations pose a relatively small inconvenience and that forty-six individual trials would be far less efficient.  (Doc. 142 at 34).  The Court agrees with Plaintiffs.  Credibility is a fact issue to be resolved by the jury, and what is perhaps SnS's best evidence on this point—the signed Certification forms—is common to all Plaintiffs.

       c.    Trial Plan

SnS finally argues that Plaintiffs' trial plan is incomplete and fails to adequately explain how the Court can manage the many and varied individual issues and defenses it seeks to raise.  (Doc. 135 at 54-67.)  Specifically, SnS asserts that the trial plain does not identify what witnesses Plaintiffs will call as representatives, how their testimony is representative of the collective as a whole, and how the Court can efficiently manage SnS's various defenses.  (*Id*. at 54-60)  In addition, SnS argues that Plaintiffs' expert testimony cannot be used to establish liability or damages.  (*Id*. at 60.)

Plaintiffs' trial plan calls for bifurcating liability and damages into two phases.  (Doc. 117 at 4.)  In the first phase, Plaintiffs will present the two named plaintiffs and "5-7 other collective class members," most likely selected "from Missouri restaurants."  (*Id*. at 5, n.1.)  In their case-in-chief, Plaintiffs intend to present representative testimony regarding the number of hours Managers were expected to and actually did work and how they were compensated.  (*Id*. at 10-11.)  To avoid having to recall any witness, Plaintiffs would also "present testimony from their representative witnesses addressing their primary job duties and the other applicable elements of the [D]efendant's affirmative defenses."  (*Id*. at 9.)  Plaintiffs assert that their experiences were materially similar collective-wide such that representative testimony will sufficiently allow the jury to determine whether they were paid in compliance with the FLSA.

Plaintiffs also argue that SnS's attack on their expert turns on the factual basis of her report and would-be testimony rather than her qualifications or methods.  (Doc. 142 at 37.)  This, Plaintiffs argue, goes to the credibility of the testimony rather than its admissibility.  (*Id*.)  Moreover, Plaintiffs assert that their expert will testify only in the second phase of trial and only if SnS is found liable in the first phase.  (*Id*.)  Plaintiffs provide case law approving of their expert's methodology.  (*Id*. at 37-41.)

The Court concludes that Plaintiffs' trial plan is not as inadequate as SnS argues.  Taken together with the parties' other filings, the trial plan appears to satisfy all of the requirements SnS suggests:  it is clear what claims and defenses are involved (misclassification of Managers, exemption, unclean hands, estoppel, timeliness), what types of evidence will be presented (job duties, day-to-day employment experiences, pay rates, corporate policies), how the evidence will be presented (two named plaintiffs and five to seven other representatives), whether the trial should proceed in phases (two:  liability and damages), and how damages will be calculated

15

(using expert testimony based on their expert's report).  SnS can surely derive sufficient detail from this plan to adequately proceed.  Moreover, the Court can later consider modifications to the trial plan that address SnS's remaining concerns.  The Court also concludes that representative evidence provides SnS with sufficient opportunity to advance some, but not all, of its affirmative defenses, but that those defenses not conducive to representative testimony can be addressed in individualized motions.

Likewise, the Court is not inclined to dismiss Plaintiffs' expert testimony out of hand based on potential credibility concerns.  *See Waitek v. Dalkon Shield Claimants Tr.*, 934 F. Supp. 1068, 1086 (N.D. Iowa 1996), (quoting *Hose v. Chicago Northwestern Transp. Co.* 70 F.3d 968, 974 (8th Cir. 1995) ("as a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination")), *aff'd*, 114 F.3d 117 (8th Cir. 1997).

At its core, this case is about whether Plaintiffs qualify as exempt executive or administrative employees.  To be sure, the answer to that question turns on the individual employment experiences of each plaintiff, but Plaintiffs' deposition testimony makes clear that those experiences are substantially similar in the most important ways:  how the Plaintiffs spend the majority of their time at work; whether and to what extent they exercise management responsibilities; the amount of independence in their day-to-day job performance; and their participation in executive and administrative processes.

### C.    Conclusion

For these reasons, the Court will deny SnS's Motion to Decertify the FLSA Collective Action.

### II.    Plaintiffs' Motion for Rule 23 Class Certification

16

Although the standards differ, "it is not mere coincidence that courts facing parallel motions to decertify an FLSA collective action under Section 216(b) and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis." *Davenport v. Charter Communications, LLC*, No. 4:12-cv-00007, 2017 WL 878029, at *8 (quoting *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 298-99 (S.D.N.Y. 2015)).

### A.    Standard

There are four requirements to advance a class action under Rule 23(a):    (1) Numerosity—the class must be "so numerous that joinder of all members is impracticable"; (2) Commonality—"there are questions of law or fact common to the class";   (3)   Typicality—"the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) Adequacy—"the representative parties will fairly and adequately protect the interests of the class." *14051 Manchester*, 301 F.R.D. at 379-80; Fed. R. Civ. P. 23(a); *see also Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559 (8th Cir. 1982).   In addition, the plaintiffs "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Davenport v. Charter Commc'ns, LLC*, 302 F.R.D. 520, 528 (E.D. Mo. 2014) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).  Plaintiffs proffer Rule 23(b)(3):  "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The burden to show compliance with Rule 23's requirements is borne by the Plaintiffs. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013); *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir. 1994).  The Court has an affirmative duty to consider the merits of an action "to the extent that they overlap with class certification issues." *Ellis v. Costco Wholesale Corp.*,

657 F.3d 970, 981 (9th Cir. 2011) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)).

## B.   Discussion

Defendants oppose Rule 23 certification on the grounds that Plaintiffs cannot satisfy the commonality, predominance and superiority, typicality, and adequacy requirements.[1]  "Because the analysis of the commonality and typicality requirements of Rule 23(a) tend to merge, the Court will focus on the commonality requirements of Rule 23(a)(2) and the predominance and superiority requirements of Rule 23(b)(3)."  *Arnold*, 2017 WL 1251033, at *10 (citations omitted).

### 1.   Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality is typically not difficult for class action plaintiffs to meet.  *14051 Manchester*, 301 F.R.D. at 380; *see also Rikard v. U.S. Auto Prot., L.L.C.*, 287 F.R.D. 486, 489-90 (E.D. Mo. 2012) ("The commonality requirement imposes a very light burden on a plaintiff seeking to certify a class and is easily satisfied.") (quoting *Mund v. EMCC, Inc.*, 259 F.R.D. 180, 183 (D. Minn. 2009)).  "[A]ny competently crafted class complaint literally raises common questions," but "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (emphasis in original) (citations omitted).  Plaintiffs' claim must "depend upon a common contention . . . of such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [individual plaintiff's] claims in one stroke."  *Id*.  A single common

---

[1] SnS does not directly address the numerosity requirement.

question that meets this standard is enough to satisfy Rule 23(a)(2), and where Plaintiffs identify at least one common question, differences between class members' claims are less relevant.  *Id.* at 359 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there *is* even a single common question.") (emphasis in original).

Plaintiffs clear the low bar for showing commonality:  each was classified by SnS corporate policy as an overtime-exempt salaried Manager.  Whether a SnS Manager qualifies as exempt is the fundamental legal question at issue in this suit, and the jury can resolve all of Plaintiffs' claims in one stroke by finding that Managers do (or do not) qualify.

### 2.    Predominance

The Rule 23(b)(3) predominance inquiry, however, is "far more demanding than the requirement of commonality."  *Luiken*, 705 F.3d at 377 (citation omitted).  "The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence."  *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) (citing *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010)).  To that end, Rule 23(b)(3) "permits certification only if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  *Behrend*, 569 U.S. at 30.  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods*, 136 S. Ct. at 1045 (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)).  If "one or more of the central issues in the action are common to the class and can be said to predominate," Rule 23

certification may be proper, "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id*. (citation omitted).

Plaintiffs assert that "[t]he same legal theory, claims, defenses, and factors to be examined will predominate" the Plaintiffs' claims.  (Doc. 131 at 62.)  They argue, "All Managers are claiming overtime is owed.  All can meet the elements of their prima facie case.  All will be subject to SnS's affirmative defense that Managers are exempt from overtime."

The Court finds that Plaintiffs have demonstrated predominance.  As discussed in detail above, their claims turn on whether SnS appropriately classified Managers as exempt executive or administrative employees, which in turn depends on a SnS Manager's primary duties.  29 C.F.R. §§ 541.100, 541.200.  Given the Plaintiffs' nearly uniform description of their day-to-day employment responsibilities, the common question of exemption predominates the selective differences highlighted by SnS.

### 3.   Superiority

Rule 23(b)(3) also directs the Court to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  In so doing, the Court considers several factors:  (A) the class members' individual interests in controlling separate actions; (B) the extent and nature of any litigation concerning the controversy already begun; (C) the desirability of concentrating the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

For the reasons discussed above, a class action would be the superior method for resolving the Plaintiffs' claims.  There is no compelling reason to host numerous individual trials when the central question in all of them is the same —*Is a SnS Manager an exempt executive or*

*administrative employee?*—and when the material aspects of Plaintiffs' employment experiences are largely identical.

### C.    Conclusion

To the extent there are differences in Plaintiffs' individual employment experiences, those differences are outweighed by the common questions of law and fact regarding SnS Managers' classification as exempt employees.  As discussed in detail above, the claim turns almost entirely on a single legal question that may be adequately tested by representative testimony.  The Court will therefore grant Plaintiffs' motion for Rule 23 certification.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Rule 23 Certification (Doc. 130) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Decertification of the Conditionally Certified FLSA Collective (Doc. 134) is **DENIED.**

**IT IS FURTHER ORDERED** that within 30 days of the date of this Memorandum and Order, the parties shall file a joint proposed schedule for the remainder of the litigation, including a proposed trial date.


Dated this 22nd day of December, 2017.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

21