UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA DRAKE and RANDY SMITH, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:14-cv-01535-JAR |
| STEAK N SHAKE OPERATIONS, INC., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Steak N Shake Operations, Inc.'s ("SnS") Motion to Exclude the Report and Testimony of Plaintiffs' Expert. (Doc. 251.) Plaintiffs oppose the motion (Doc. 259), and SnS has filed a reply in support (Doc. 262).

### Background

Plaintiffs are two classes of current and former Managers who seek unpaid overtime wages for their work in restaurants in SnS's St. Louis Market: a class of 275 Managers proceeding under Missouri Rule of Civil Procedure 23 ("Missouri Managers") and an opt-in class of eleven Managers proceeding under the Fair Labor Standards Act ("FLSA") ("FLSA Class"). (Doc. 259 at 2.) Plaintiffs intend to offer the report and testimony of Leisel M. Fox, Ph.D. to assist the jury in determining damages in the event SnS is found liable. (*See* Doc. 259-1.)

Dr. Fox's report attempts to calculate a total amount of damages for each plaintiff by multiplying the plaintiff's average hourly rate by the number of hours he or she worked during

1

the class period. (*Id.*) SnS's records list each plaintiff's pay information. In determining how many hours each Plaintiff worked, Dr. Fox considered four sources of data. (*Id.*) The first was a questionnaire sent by SnS during discovery. (*Id.* at 5.) All eleven FLSA Class members and thirty-six Missouri Managers who were then part of the FLSA Class responded. (*Id.* at 5.) The second was a questionnaire sent by Plaintiffs' counsel to the Missouri Managers. (*Id.*; Doc. 259-2.) Forty-seven responded, again under oath. (Docs. 259-1, 259-2.) Together, these responses provided a personal average number of hours worked for all eleven FLSA Class members and eighty-three of the 275 Missouri Managers.

For the remaining 192 Missouri Managers, Dr. Fox first considered a third source: an internal SnS document titled "2016 Overtime Regulation," which summarized SnS's examination of Managers' weekly hours conducted to assist in determining whether to convert Managers from salaried employees to hourly employees in response to the Department of Labor's announced change to overtime regulations. (Doc. 259-1 at 5-6.) That survey revealed that the average SnS Manager worked fifty-two to fifty-four hours per week.[1] (*Id.* at 5.) Dr. Fox's final source was timeclock data from November 2016 to January 2017, during which time SnS did pay Managers as non-exempt hourly employees, which showed an average of 54.2 hours per week. (*Id.*) In light of those sources, Dr. Fox employed an average of fifty-four hours per week for all plaintiffs who did not provide their own personal average in response to either questionnaire.

Dr. Fox's use of the various source data to determine each Plaintiff's average hours worked can be summarized as follows:

- For the eleven FLSA Class members and the thirty-six Missouri Managers who were previously part of the FLSA Class: an individualized number

---

[1] There is some debate as to whether the survey produced a range or a solid fifty-four-hour average.

- based on his or her actual response to SnS's discovery questionnaire, provided under oath;

- For the forty-seven Missouri Managers who responded to Plaintiffs' counsel's questionnaire: an individualized number based on his or her actual response to Plaintiffs' questionnaire, provided under oath;

- For the 192 Missouri Managers who did not respond to Plaintiff's counsel's questionnaire: a general average of fifty-four hours per week, based on SnS's internal survey and timeclock data.

(Doc. 259 at 5.) Using those numbers, Dr. Fox calculated how many hours each plaintiff would have worked during the class period, subtracting hours for vacation time, sick days, holidays, and other time off, as listed on internal SnS records. (Doc. 259-1 at 6-7.)

Dr. Fox then multiplied the number of hours each plaintiff worked during the class period by that plaintiff's hourly pay. To determine a weekly rate, Dr. Fox divided each Manager's yearly salary by fifty-two, applying salary increases to the week they became effective and thereafter, and accounting for any bonus payments. (*Id.* at 7-8.) Dr. Fox then divided each Manager's weekly pay rate by fifty hours. (*Id.* at 7.) She used fifty hours because SnS Managers are scheduled fifty hours per week and because SnS used a fifty-hour workweek to determine each Manager's hourly rate during the period in which it payed Managers as hourly employees. (*Id.* at 7 n.18.)

By multiplying each plaintiff's total hours worked by his or her hourly pay rate, Dr. Fox was able to determine the overtime due for all work beyond forty hours. Because Plaintiffs were paid their hourly rate for hours forty to fifty, Dr. Fox multiplied those hours by one half times that plaintiff's hourly rate, adding only the unpaid overtime premium. (*Id.* at 7-8.) Because Plaintiffs were paid for fifty hours of work, Dr. Fox multiplied any hours above fifty by the full overtime rate of one and one half times hourly rate. (*Id.*) The result is a chart listing the total unpaid overtime for each of the 286 plaintiffs. (Doc. 259-1 at 15-22.) Dr. Fox also included a

calculation of total damages for each. (*Id*.; *see* Mo. Rev. Stat. § 290.527 (authorizing liquidated damages in the amount of unpaid overtime).)

SnS challenges a number of Dr. Fox's assumptions and argues that her calculations are based on unreliable sources. (Doc. 252.) Specifically, it argues that the questionnaires are unscientific surveys which Dr. Fox neither helped prepare nor reviewed and that she did not verify the accuracy of the responses. (*Id*.) In addition, SnS argues that Dr. Fox failed to account for biases inherent in the surveys, further eroding the reliability of the source material. (*Id*.) Finally, SnS argues that because Dr. Fox's report is little more than simple arithmetic that the jury is capable of doing itself, her report will not assist the trier of fact. (*Id*.)

## Discussion

The federal rules of evidence and related case law require that an expert be qualified and that the expert's testimony be both reliable and relevant. *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). SnS does not attack Dr. Fox's qualifications. Instead, it argues that Dr. Fox's sources are unreliably biased, unverified, and substandard, and argues that her conclusions are the result of basic arithmetic which can and should be left to the jury. (*Id*.)

### 1. *Reliability*

Reliability hinges on the sufficiency of the facts or data on which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case. Fed. R. Evid. 702.

SnS first argues that Plaintiffs' and SnS's internal questionnaires fall short of the strict requirements for reliable scientific surveys. (Doc. 252 at 5.) It quotes *Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 378 (8th Cir. 1987), for the standard courts should apply to survey results:

4

> To establish the trustworthiness of a survey, it must be shown (1) that a proper "universe" was examined and a representative sample was chosen; (2) that the persons conducting the survey were experts; (3) that the data were properly gathered and accurately reported; (4) that the sample design, the questionnaires, and the manner of interviewing met the standards of objective surveying statistical techniques; and (5) that the interviewers, as well as the respondents, were unaware of the purpose of the survey.

SnS expressly argues that Dr. Fox was not involved in the creation or analysis of the survey, did not verify the accuracy of the responses, and that respondents knew the purpose of the survey. (Doc. 252 at 5-6.)

The Court disagrees that the *Lutheran Mutual* standard is appropriate here because the Court does not believe the questionnaires considered by Dr. Fox in this case are "surveys." They were never intended to obtain a representative sample from which a comprehensive statistical result could be derived. The ninety-four responses are being offered as evidence of each of the ninety-four respondents' individual claims for damages. Dr. Fox makes no attempt to use any class member's response in calculating the damages for any other class member. In this way, the questionnaire responses are much more like testimony—individual statements, based on personal knowledge, given under oath. The Court therefore rejects SnS's argument that it must exclude the questionnaires because they fall short of the strict standards set for comprehensive statistical surveys.

SnS additionally argues that Dr. Fox's failure to verify the questionnaire responses undermines the reliability of her conclusions in several ways. SnS notes that because Dr. Fox "ha[s] never seen the actual [questionnaire] responses . . . only the table created and provided to her by Plaintiff's counsel," she could not verify the accuracy of the table. (Doc. 252 at 2.) In addition, SnS notes that Dr. Fox failed to validate the respondents' understanding of the questions asked, the truth of the answers they gave, or their memories. (*Id*. at 3-12.) SnS next asserts that Dr. Fox did not account for bias in the responses, arguing that, because the class

members knew that their answers would be used to determine damages, those who worked fewer hours might have inflated their estimates or refused to respond altogether. (*Id*.) Finally, SnS argues that Dr. Fox misused the available timeclock data. (*Id*. at 3-4, 8-10.) SnS specifically asserts that those records are better evidence of the actual hours worked than self-serving and biased responses to questionnaires, that Dr. Fox could have compared the questionnaire responses to the timeclock records to determine that the responses were not wildly off base, and that when Dr. Fox *did* use the timeclock data—in determining an average for class members who did not respond to the questionnaires—she unreasonably ignored weeks in which Managers did not accrue fifty hours of work. (*Id*.)

These arguments boil down to attacks on the factual basis for Dr. Fox's report. It is well settled that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) (quoting *Hose v. Chicago Northwestern Transportation Co.,* 70 F.3d 968, 974 (8th Cir. 1995)). Put simply, if Plaintiffs can convince the jury that SnS owes them unpaid overtime, SnS will have an opportunity to convince the jury that it does not owe as much as Dr. Fox says.

### 2. *Relevance*

To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Relevance requires the expert's testimony relate to an issue in the case. *See Daubert*, 509 U.S. at 591. "[D]oubts regarding the usefulness of an expert's testimony" are resolved in favor of admissibility, *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir.2006); *accord Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014), because "[a]n expert's opinion should be excluded only if that opinion is so

fundamentally unsupported that it can offer no assistance to the jury, *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir.2007) (internal quotation marks and citation omitted).

"When an employer maintains accurate time records, as required under the FLSA, employees can satisfy their evidentiary burden by securing those accurate time records." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013). However, where, as here, an employer fails to maintain accurate time records, courts apply "a relaxed evidentiary standard" under which the employees need only prove the existence of uncompensated work, not its precise extent. *Id*.

Thus, if Plaintiffs can show work was performed for which they were not compensated, they need only present "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id*. "The burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference." *Id*. The question, therefore, is whether Dr. Fox's report includes sufficient evidence to assist the jury in making a just and reasonable inference as to the amount and extent of unpaid work by Plaintiffs. The Court concludes that it does and that therefore it is relevant.

Specifically, the Court notes that Dr. Fox's report calculates an individual amount owed for each of the 286 class members, accounting for their individual pay rates, mid-year pay increases, time off for sick leave and vacation. (Doc. 259-1.) As SnS argues, those figures are the result of basic arithmetic processes, and the Court has little doubt that the members of a jury are capable of performing basic arithmetic. Nevertheless, the Court believes that Dr. Fox's report presents a convenient and less cumbersome way to assess the necessary calculations, and that it would be of significant assistance to the jury.

**Conclusion**

The Court concludes that Dr. Fox's report is both reliable and relevant. SnS's arguments to the contrary largely go to the weight of the report and not its admissibility.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Steak N Shake Operations, Inc.'s ("SnS") Motion to Exclude the Report and Testimony of Plaintiffs' Expert (Doc. 251), is **DENIED.**

Dated this 25th Day of January, 2019.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE